DIXON, Chief Judge
(dissenting):
I am not satisfied that appellant’s conviction was correct in law and fact and therefore believe we should set aside his conviction. I share Judge Schreieris view that the military judge erred in admitting that portion of Dr. Pflug’s testimony concerning the testing of the blood stains found on the ax seized from Building 243 and those found on the fibers removed from the automobile appellant had rented. The arguments she advances in her concurring opinions regarding the inadmissibility of this key evidence are compelling. However, I disagree with her concerning the impact of the military judge’s ruling on the ultimate outcome. The evidence against appellant was entirely circumstantial. Taken as a whole, it certainly suggests the appellant possessed a motive and had sufficient opportunities to commit this crime. However, motive and opportunity alone are rarely sufficient to convict an accused of murder. Generally, there must be some evidence linking the accused to the crime itself. The link was established here by the scientific evidence derived from the ax and the rented automobile. Unlike Judge Schreier, I am not convinced the members would have convicted appellant in the absence of that evidence.
This case involves two separate and distinct types of DNA evidence. At trial, the defense moved to have all DNA evidence pertaining to this case excluded. I believe the military judge erred by failing to distinguish between the DNA evidence which was shown to be relevant and reliable from DNA evidence which was not shown to be relevant and reliable. The DNA evidence used to identify the corpse as Ms. Pengson was obtained by the technique called RFLP. There was no dispute in this case that the RFLP was properly conducted and the RFLP technique is widely accepted as producing scientifically reliable results. On the other hand, the DNA evidence pertaining to blood stains found on the ax and on fibers taken from the rental car was derived from a different technique called PCR. The preponderance of the evidence offered at trial suggests that the type of PCR utilized by Dr. Pflug (specifically Amp-FLP analysis in the Apo-B region) does not produce scientifically reliable results.
The admissibility of scientific evidence at courts-martial is governed by Mil.R.Evid 702. The rule states:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
In determining whether to admit scientific evidence, trial judges are expected to exercise a “gatekeeping” function. In describing the role of the trial judge, the Supreme Court in Daubert v. Merrell Dow Pharma *643 ceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) stated:
That the Frye test was displaced by Rules of Evidence does not mean, however, that the Rules themselves place no limits on the admissibility of purportedly scientific evidence. Nor is the trial judge disabled from screening such evidence. To the contrary, under the Rules the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.
Unlike what is contemplated by Daubert, I believe the military judge in this case ignored the preponderance of the evidence concerning the scientific validity of this technique and erroneously permitted the fact finders to determine its validity. In effect, he allowed the fact finders to perform the “gatekeeping” function. In ruling on the admissibility of the DNA evidence at trial, the military judge addressed the issue of the PCR test as follows:
With respect to the PCR test, the application of that test yielded results which may or may not be accepted, but on the facts of this case in an emerging area not yet validated in the United States and where protocols may be in dispute among experts in the field, it is for the fact finders to determine.
I contend the ruling of the military judge admitting the DNA testimony concerning the blood stains on the ax and fibers from the rental car materially prejudiced the appellant. The mere fact that the technique had never been admitted in any criminal case in the United States is alone enough to call for close scrutiny of the judge’s ruling. However, it is not the relative newness of the technique, or the absence of known error rates, that most concerns me. Nor is it the fact that Dr. Pflug!s laboratory is the only crime lab using the test in question. Rather, it is the fact that the preponderance of the testimony presented at the Article 39(a) hearing suggests that PCR technique using the Amp-FLP analysis of the Apo-B region does not produce forensically valid results.
Specifically, there was undisputed testimony that both the FBI and the Royal Canadian Mounted Police had rejected the use of Amp-FLP testing in the Apo-B region after experimenting with it and finding it had a number of problems for use in forensic analysis. Dr. Eisenberg, the defense consultant who was recognized as an expert in the field of DNA, testified that in his opinion “the Amp-FLP analysis of the Apo-B region relating specifically to the ax and any material derived from the car either by tape lifts or from the trunk must be viewed as uninterpretable, inconclusive, and no criteria either match or non-match can be applied to that analysis.” Dr. Eisenberg, an active collaborative consultant with both the FBI’s DNA laboratory as well with the Royal Canadian Mounted Police equivalent laboratory in Canada, explained that his major concern with the reliability of the test was the absence of a “known positive control.” When asked as an expert in the area of DNA forensics if he thought allowing the information relating to the ax and car to come before the jury would assist them, he responded:
No, sir, I do not think it would assist them. I think it would in fact not be proper because I don’t believe as a scientist that there’s any basis for any interpretation. The fact that things may visually appear similar is by no means a sufficient criteria for the evaluation of a match or no match.
Even more significant in my view is the fact the government’s own DNA consultant, Dr. Holland, testified that, as a scientist in the American community, he would have to report the tests performed from the ax and car fibers as “inconclusive.” He stated American and Canadian laboratories would also have reported the tests as “inconclusive.” In the final analysis, the admissibility of this evidence rests on the opinion of one scientist, who claims contrary to the experience of all other laboratories, that he could call the test results a “match” on the basis of visible observations alone. Despite the overwhelming evidence that no valid results could be reached from Dr. Pflug’s PCR technique using the Amp-FLP analysis of the Apo-B region, the military judge allowed the fact finders to reach their own conclusions about the validity of the scientific tests. I believe he not only failed to perform the required “gatekeeping function” but erred in permits *644 ting the fact finders to consider highly unreliable scientific evidence. The fact finders are well equipped to determine what conclusions should be drawn from valid scientific evidence but cannot be expected to determine whether or not novel scientific evidence is valid.
I will not engage in speculation as to whether members would have found appellant guilty of murder had the DNA evidence from the ax and car fibers not been admitted. Since this was the only evidence that provides some direct link between the appellant and the crime, I cannot say its erroneous admission was harmless error.
The prosecution could not prove the appellant was guilty by direct evidence. Instead it relied upon bits and pieces of circumstantial evidence that pointed to appellant’s guilt. They were able to establish a motive. Moreover, they established the victim was last seen on Saturday evening when she departed a party with the stated intention of meeting appellant. They were able to point to inconsistencies in appellant’s account concerning his plans for the weekend, unusual visits to his duty locations during the weekend, and an implausible explanation of why he rented a car. A witness also testified he saw a car bearing some similarities to the one appellant rented rapidly leaving the area where the victim’s torso was found early on Monday morning. However, by far, the strongest pieces of circumstantial evidence relied upon by the prosecution to convict appellant were the results of DNA tests performed by Dr. Pflug on microstrains obtained from the ax and car fibers. Without this critical evidence, which Judge Schreier and I believe should have been ruled inadmissible, I am not convinced the members would have found the evidence sufficient beyond a reasonable doubt to convict appellant. Accordingly, I would set aside appellant’s conviction and authorize a rehearing.